## Case No. 5,543.

GOODRICH et al. v. The DOMINGO, et al.

[1 Sawy. 182.] [1]

District Court, D. California. June 7, 1870.[2]

### FISHING VESSELS—RIGHTS OF SEAMEN.

Where by the articles the crew of a fishing vessel were bound to make the fish, and on the arrival of the vessel the owners declined to allow them to do so, and the men remained by the vessel for nearly two months, at all times ready and willing to make the fish, and then left her and sued for their shares of the catch, *held*, that their readiness and willingness to make the fish were equivalent to an actual performance of their contract; and that they were entitled to be paid their shares. Various charges made by the owners disallowed.

[This was a libel by Foster C. Goodrich and others against the owners of the bark Domingo.]

Milton Andros, for libellants.
W. H. L. Barnes, for claimants.

1 [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]
2 [Affirmed by the circuit court. Case not reported.]

HOFFMAN, District Judge. This suit is brought to recover the shares due the libellants of the proceeds of the catch of fish, on a fishing voyage in the above vessel. The contract, as stated in the articles, which were signed at Honolulu, is as follows:

"The crew shall receive instead of monthly wages two fifths of the sales of the fish taken on said voyage. It is intended and agreed to hire as many men as it is deemed advisable to fish on said voyage, the crew or sharesmen to pay the wages of said hired men, and they are to draw two fifths of the sales of said fish caught by them. They, the sharesmen, are also to pay two fifths of all expenses, viz.: clearing and entering the vessel, pilotage, wharfage, storage, flake hire, duties, commissions, and other expenses which may be incurred in the sales of the proceeds of said voyage. The crew to dry the fish and deliver them on the wharf in San Francisco. They, the sharesmen, are to pay two fifths of the cook's wages on said voyage."

Under this agreement, the vessel on May 12, 1869, proceeded on her voyage, having on board some eight or ten Kanakas, hired in accordance with its terms. She arrived at this port on the twenty-seventh October, with about eighty tons of fish. The men at once applied to the master and owners to proceed to dry, or as the technical phrase is, "make" the fish, offering their services for the purpose. But, though frequently solicited, the master and owners declined to allow the fish to be made. The men were unable to obtain any settlement or compensation, and fearful of impairing their rights by leaving the vessel, remained on board until the eighteenth December, but they did no work, and paid their own expenses for subsistence.

The reason assigned by the owners for their delay in making the fish is the following: At the time of the arrival of the vessel the market for fish was greatly overstocked. The nominal price was twelve cents per pound, but this could only be obtained for small quantities, and was due to the fact that all the holders of the article had entered into a combination by which all the fish in the market were put into a common stock, and held at a fixed price. All sales made by the common agent of all the parties, were credited to each in the proportion which his contribution to the common stock bore to the whole.

As the stock of made fish was more than sufficient to supply the demand, it was for the interest of the owners of the Domingo's cargo to postpone the making of the fish; for when made they are liable to deteriorate in quality; and the cargo, though not made, was credited to them as a contribution to the common fund, and entitling them to receive its proportional share of any sales which might be made.

The making of the Domingo's fish was, therefore, not commenced until February, 1870, and a considerable portion of the cargo still remains unsold, or to speak more accurately, the owners have not received on account of that cargo, shares of the proceeds of sales amounting to more than about twenty or twenty-five per cent. of its entire value. But they have received on account of sales credited to other cargoes owned by them and put into the common stock, sums exceeding in amount the value of the Domingo's cargo, had all the sales been credited to that cargo alone.

It is contended on the part of the respondents, that, inasmuch as the articles are silent as to the time within which the fish were to be made—that the law will imply that it was to be done within a reasonable time—and that the time taken, was not, under the circumstances, unreasonable. To this latter proposition I cannot assent. The owners were entitled to a reasonable time—but it was a reasonable time to make the fish with all convenient and usual despatch. The nature of the agreement and the fact that the sharesmen were seamen, who looked to their share of the proceeds as their only compensation for their services, forbid the idea that it could have been intended that they should wait an indefinite period at their own charges, in port, until the state of the market might make it for the interest of the owners to dry the fish, or until the proceeds of the cargo might be realized by the slow process which the owners, in view of their interest in other cargoes, saw fit to adopt.

I consider, therefore, the readiness and willingness on the part of the men to make the fish, as equivalent to a performance by them of their agreement, and that the refusal of the master and owners to allow them to do so for so long a period, amounted to a waiver by the latter of that part of the sharesmen's contract. The men, therefore, have the same rights as if they had actually made the fish, nor can any charge be allowed against them for the wages and provisions of the substitutes who were subsequently hired to do the work.

These charges must, therefore, be struck out of the account rendered by the owners. In this account are embraced two sets of charges. The first claimed to be payable in full by the sharesmen. The second are those for only two fifths of which they are charged. Amongst the first are several items of expenses incidental to the shipment of the Kanakas.

The chief items are for expense of drawing a bond for the return of the Hawaiian seamen; for tax to Hawaiian government for passage money of Kanakas from this port to Honolulu, after their discharge; for fees to Hawaiian consul at this port. All these expenses were no doubt necessarily incidental to the employment of the Hawaiian seamen. But I am at loss to perceive how they can be charged to the sharesmen. By the articles, the latter agreed to pay the wages of the men

hired at Honolulu, but nothing more. Nor does it seem unreasonable to restrict their liability to the payment of wages; for the expense of supplying provisions, which fell upon the ship, bore but a small proportion to the wages, which were to be paid by the sharesmen, while the ship received three-fifths of the fish caught by the Kanakas, and the sharesmen only two-fifths.

Even if the terms of the contract were doubtful or ambiguous, the court, by a well settled rule, would be bound to give to it a construction most favorable to the seamen. Wope v. Hemenway [Case No. 18,042]; Jansen v. The Theodor Heinrich [Id. 7,215]. But there is no ambiguity; and to charge the sharesmen, under an agreement to pay "wages," with the other incidental and consequential expenses attendant upon the hiring of the men, would be, not to construe the contract, but to introduce into it an entirely new stipulation. The charge for wages paid to the Kanakas must, therefore, be confined to the payments made to them for wages earned during the voyage and up to its termination.

Among the expenses, two fifths of which are charged to the sharesmen, are two items for pilotage into and wharfage at Honolulu. These charges are defended on the ground, that although the shipping articles for the fishing voyage were signed at Honolulu, yet the men had originally joined the ship at this port, with the understanding that she was to proceed to Sydney and thence to Honolulu, where the Kanakas were to be hired and the fishing voyage was to commence. It is therefore claimed, that the charge for pilotage in going into Honolulu and of wharfage while there, should be borne by the men. This claim is wholly inadmissible.

The men did not sail from Honolulu under any contract made at this port. Not only was a new agreement made at the former place, but it appears in proof that they had been previously discharged and their connection with the ship completely severed. The new engagement was entered into at the master's solicitation, and after some little hesitation on the part of the men. It referred to the voyage then to be commenced, and the charges for pilotage, wharfage, etc., to be borne by the men, were charges to be incurred in the course of the voyage to which the articles referred.

To charge them with an expense incurred and paid by the ship before the agreement was entered into, would be absurd. It may be, however, that some part of the wharfage expense was incurred on account of the fishing voyage, while the vessel was taking in salt or other supplies. I shall, therefore, allow one half of this item. There are also charged to the men two fifths of the fees paid to the custom house inspector on duty while the vessel remained undischarged at this port. They amount in all to $272.01.

In respect to these, it is to be observed that they must in great part have been incurred in consequence of the owners' determination to postpone for several months the discharge of the ship. It would be manifestly unjust to charge the whole expense of this to the men, even if they were liable for any part of it. But, in fact, they are not liable for any part. Their agreement was to pay two fifths of the duties, other than for entering and clearing the vessel; custom house charges are not mentioned. The articles were drawn by the owners. Had it been intended to include inspector's fees, it should have been so stated.

The remaining item objected to on the part of the libellants is a charge of two fifths of a certain allowance, or, as it is called, "commission," paid to the master. It amounts to one half a cent per pound on the whole catch. This appears to be the usual allowance to the master of a fishing vessel, and in this case constituted his only compensation. The articles provide that the sharesmen are to pay two fifths of "all expenses, viz.: clearing and entering the vessel, pilotage, wharfage, storage, flake hire, duties, commissions and other expenses which may be incurred in the sales of the proceeds of the said voyage." The commissions here referred to are evidently commissions on the sales of the proceeds of the voyage. The compensation or allowance to the master in lieu of wages, can hardly be called a "commission," and if the men, in addition to paying the wages of the Kanakas, and two fifths of the wages of the cook were also to pay two fifths of the master's wages or compensation, it should have been so stated in clear and unequivocal terms. The charge must, therefore, be disallowed.

In the account rendered by the owners the value of the fish is stated at eight cents per pound. This is quite as much, perhaps more, than could have been justly claimed, had the owners, on the arrival of the vessel and when they determined to enter into the combination and postpone indefinitely the drying of the fish, made a prompt settlement with the men.

But I regard this valuation of the cargo by the owners in their account rendered to the men as an admission, and in view of the long and unjust delay (more than seven months) to which the seamen have been subjected, I think they should be bound by it. The account must, therefore, be referred to the clerk to be restated in accordance with the foregoing, all items not herein rejected to be allowed, and a decree entered in favor of the libellants for the amounts found due to them respectively.

[Decree affirmed on appeal, at the October term, 1870, of the circuit court, by Sawyer, Circuit Judge. Case unreported.]

———

GOODRICH (GILMORE v.). See Case No. 5,447.

GOODRICH (GOSSLER v.). See Case No. 5,631.

GOODRICH (GREENLEAF v.). See Case No. 5,778.